**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| BAIS MEDRASH OF OWINGS MILLS INC., <br><br> Plaintiff, <br><br> v. <br><br> BALTIMORE COUNTY, MARYLAND, and BOARD OF APPEALS OF BALTIMORE COUNTY, MARYLAND. <br><br> Defendants. | Civil No. 1:26-cv-01171 <br><br> **COMPLAINT** |

Plaintiff BAIS MEDRASH OF OWINGS MILLS INC. ("Bais Medrash"), by its attorneys, Neuberger, Quinn, Gielen, Rubin & Giber, P.A., hereby complain of Defendant BOARD OF APPEALS OF BALTIMORE COUNTY ("BOA"), and BALTIMORE COUNTY, MARYLAND ("County") (collectively, "Defendants") as follows:

**NATURE OF ACTION**

1.      This action is commenced by the Plaintiff to redress violations of its civil rights, as protected by the Free Exercise Clause of the United States Constitution, 42 U.S.C. § 1983, the Due Process and Equal Protection Clauses of the Fourteenth Amendment, 42 U.S.C. § 1983, the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §§ 2000cc, *et seq.* ("RLUIPA"), the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3604 and 3617, the Maryland Constitution's Declaration of Rights, Article 36 and state law, caused by the County Defendants' burdensome and discriminatory land use regulations that have prevented Bais Medrash from finding a permanent home in ways that restrict the free exercise of its religious beliefs and

1

practices, as a condition of it being able to build a facility that is adequate for its religious exercise as a rabbinical college with dormitories on real property located at 10729 Park Heights Avenue, Owings Mills, Baltimore County Maryland 21117.

2. Specifically, the BOA, in considering and approving Plaintiff's Petition for Special Exception and Special Hearing has imposed onerous conditions including, but not limited to: 1) limiting the number of boarding students to 48; 2) going through a further review process to obtain the permission of County authorities to offer onsite food service and/or onsite laundry service; 3) prohibiting any student at Bais Medrash from having his own vehicle for transportation "except in exceptional circumstance," and limiting Bais Medrash to two vehicles onsite for the use of all of the students; 4) prohibiting Bais Medrash from using the Property for any events that are not school functions, and requiring that any events or functions conclude any activity outside of the school buildings by 10:00 p.m.; and 5) requiring that any outdoor events that use enhanced audio equipment shall be kept to a minimum, and no enhanced audio equipment can be used after 8:00 p.m.

3. These unreasonable conditions imposed by the BOA discriminate against the Plaintiff and substantially burden the Bais Medrash's religious exercise without being the least restrictive means of achieving any compelling governmental interest.

## PARTIES

4. Plaintiff BAIS MEDRASH OF OWINGS MILLS INC. is a Domestic Not-for-Profit Corporation formed under the laws of the State of Maryland with a Principal Office Address of 6111 Biltmore Avenue, Baltimore, MD 21215.

5.    Defendant BOARD OF APPEALS OF BALTIMORE COUNTY is a board of appeals duly appointed pursuant to the Charter of Baltimore County, Maryland, Article VI, §§ 601-602, to consider appeals from orders relating to zoning.

6.    Defendant BALTIMORE COUNTY, MARYLAND is a chartered county of the State of Maryland, having offices at 400 Washington Avenue, Towson, Maryland, which, through the governing body, adopted the land use regulations in question in this matter.

7.    Plaintiff Bais Medrash is a religious assembly or institution, as that term is used in 42 U.S.C. § 2000cc(b)(1).

8.    Each of these Defendants is a "government" within the meaning of 42 U.S.C. § 2000cc-5(4)(A).

## JURISDICTION AND VENUE

9.    The subject matter jurisdiction of this Court is founded upon 28 U.S.C. § 1331 (federal question jurisdiction) in that this action is brought under 42 U.S.C. §§ 2000cc, *et seq.*, 42 U.S.C. § 1983, 42 U.S.C. §§ 3604 and 3617.  This Court also has supplemental jurisdiction over Counts VIII and IX under 28 U.S.C. § 1367(a) for Plaintiff's claims brought under Maryland law.

10.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) in that all of the events giving rise to the claims herein occurred in this District, and the Defendants are subject to personal jurisdiction in this District as of the commencement of this action.

## FACTUAL ALLEGATIONS

Plaintiff's Religious Exercise

3

11.     Bais Medrash is a not-for-profit corporation established in 2023 to conduct religious worship services and educational programs in accordance with Orthodox Jewish law and tradition.

12.     Rabbi Nosson Newman is the Rosh Yeshivah, or head of school, at Bais Medrash.

13.     Rabbi Newman is a dedicated Jewish educator who has worked in Jewish education in New York, Israel, and Baltimore.

14.     Rabbi Newman taught at a high school in Baltimore prior to founding Bais Medrash of Owings Mills.

15.     Rabbi Newman was motivated to found Bais Medrash through a love of education and of guiding students to a full and clear understanding of foundational religious texts.

16.     Orthodox Judaism teaches, and Bais Medrash believes, that religious study for adult men is foundational to Jewish practice and crucial to sustaining Jewish life.

17.     Orthodox Jewish boys and young men are encouraged to extend their religious studies after high school by enrolling in a rabbinical college, or *yeshiva*.

18.     These rabbinical colleges are in the model of Jewish institutions that flourished in Eastern Europe prior to WWII.  In prior centuries such institutions principally existed in Europe, but many of them were destroyed or closed during the *Shoah* (the Holocaust) in the 1930s and 1940s.  As a result, there are far too few such institutions, especially ones of high caliber, like the one proposed by the Bais Medrash.

19.     Bais Medrash's program is a four-year course of study, which will qualify students for post-graduate Talmudic studies and practice.

20.     Most students complete their final year of study in Israel at a similar institution.

21.     It is the Bais Medrash's  sincerely held religious belief to offer this program.

22.    Bais Medrash's curriculum is mainly structured on the study of the Talmud.  There are three different Talmud courses: Talmud Intensive, Talmud Research and Talmud Survey.  In addition, students also study *Halacha*, or Jewish Law, and *Mussar*, or Jewish Ethics and Philosophy.

23.    The Talmud comprises the central core of the Torah's oral tradition passed down for generations since the year 1312 BCE.  The Talmud is a compilation of legal, historical and ethical case studies and didactic texts written in a combination of ancient Aramaic and Hebrew.

24.    Studied over the centuries, Jews have built upon this foundation of traditional wisdom over the course of the Diaspora, and thousands of companion volumes have been authored to elucidate and elaborate upon these ancient texts.

25.    The study of Talmud is complex and demanding.

26.    Two important methods of studying the Talmud are the *chavrusa*, or study partner, system and *shiurim*, or faculty lectures.

27.    The Yeshiva intends to use both methods of study.

28.    Students at Bais Medrash engage in religious study for 10 to 15 hours per day, seven days a week.

29.    Bais Medrash's curriculum does not include secular academic studies.

30.    Bais Medrash sincerely believes that the Torah, correctly understood, is not simply a text.  Historically, it has always been understood that the Torah has two parts, a "Written Torah" and an "Oral Torah."

31.    The main part of the written Torah is the Pentateuch or Five Books of Moses, eight books of the Prophets, and eleven books of the Writings.  However, this comprises but a fraction of the studies called Torah.  The Bais Medrash believes that there is a much larger segment of the

5

Torah, which is called the Oral Torah.  It is so called because it is understood that a student should study with a Rabbi who is a teacher and a mentor and who could give the student the fullest understanding possible of the material and who could see his reactions, gauge his comprehension and also serve as a role model of how to live these truths.

32.	Bais Medrash's approach particularly involves building personal relationships with students.

33.	This relationship-building allows for teachers to truly guide their students during the learning process.

34.	The relationships between students are also vitally important.

35.	The students are unmarried men between the ages of 16 and 20.

36.	The educational environment is highly intensive and disciplined, which results in a quiet and structured residential and educational environment.

37.	Bais Medrash's approach has a particular focus on learning more of the Talmud in a short period of time, without sacrificing clarity or the depth of learning.

38.	During the many hours of daily study, some portions of study are faster and some are slower.

39.	This keeps students engaged as well as challenges them to learn.

40.	Through partnered study, the Bais Medrash believes students will be able to learn a greater portion of the Oral Torah.

41.	Having *chevrusa* at all levels of study is vitally important to this aspect of the Bais Medrash's religious mission.

42.	Traditional Jewish practice requires that men say certain prayers, which may only be said within a *minyan*, a group of ten Jewish adult men of sound mind.

43. On a typical school day, students begin their day around 7:30 a.m. and engage in morning prayers for an hour or longer before breakfast.

44. Students then study the Torah for about four hours before lunch, including an hour of classroom education and three hours of study with a partner.

45. After lunch, students engage in religious studies for another three hours before dinner.

46. Students study the Torah for another three hours after dinner and then engage in nighttime prayer.

47. After a full day of prayers and studying, students typically go to bed around 10:30 p.m.

48. Students are engaged in their religious education throughout the whole day and do not have time to engage in outside activities.

The Subject Property

49. The Property, sometimes locally known as "Rainbow Hall," is located at 10729 Park Heights Avenue in Owings Mills, Baltimore County, MD ("Subject Property").

50. In 2023, Plaintiff 10729 Park Heights Ave, LLC purchased the Subject Property.

51. Prior to purchasing the Subject Property, students had to be housed off-site.

52. This off-site housing of students detracts from the important educational experience of complete immersion in study and from the benefit of being part of a total community.

53. Rabbi Newman looked for alternative properties before purchasing the Subject Property.

54. Rabbi Newman's real estate agent told him that no real alternative sites in Baltimore County were available which could accommodate the rabbinical college.

7

55.     Rabbi Newman's real estate agent further informed him that there would be community opposition to the rabbinical college no matter where it sought to locate.

56.     The Subject Property includes a 45,000-square foot historic mansion with an attached non-historic, two-story dormitory wing, two single-family homes, and a cottage.

57.     The 45,000-square foot mansion has four distinct residential wings and encompasses two sprawling floors, without counting a partially finished basement and an attic.

58.     The historic mansion was in a state of disrepair when Rabbi Newman purchased the building.

59.     Rabbi Newman invested over one million dollars to preserve the mansion, recognizing both its historic value and its future uses for religious education.

60.     The Subject Property is an approximately 20-acre parcel.

61.     The Subject Property has two vehicle access points, to the north and south, along Park Heights Avenue.

62.     The Subject Property has two large parking lots.

63.     Upon information and belief, the larger of the two parking lots can accommodate approximately 60 cars.

64.     The area surrounding the Subject Property is rural and residential.

65.     The subject Property is located primarily in the Resource Conservation - Agricultural Zone ("RC-2"), with a small portion in the Resource Conservation - Rural-Residential Zone ("RC-5").

66.     Near the Subject Property is a mechanic shop called Automotive Specialty Tool LLC (0.3 miles away), a spiritual practice called Practice for Us (0.5 miles away), the Jemicy

School (0.8 miles away), the Bais Yaakov School for Girls (1 mile away), and the Sam Robinson Fine Art Gallery (1 mile away).

## PRIOR USE OF THE SUBJECT PROPERTY

67.     The historic mansion, constructed between 1915 and 1917 in the Beaux-Arts style, was the property of General Douglas MacArthur in the 1920s.

68.     General MacArthur named the Subject Property "Rainbow Hill" (later known as "Rainbow Hall") to commemorate the 42nd Rainbow Division that he commanded during World War I.

69.     The Property is listed on the Baltimore County Final Landmarks List as Final Landmark No. 198.

70.     In 1940, Henry Rosenberg, president of Crown Central Petroleum, purchased the historic mansion with his wife Ruth for use as a private residence.

71.     The Rosenberg family later sold the Subject property to investors who intended to operate a private golf club with apartments, dining facilities, and catering facilities.

72.     In 1963, the Rainbow Hill Corporation and the Baptist Home of Maryland, Inc. purchased the entire estate including the historic mansion, two single-family homes, and the cottage and conducted renovations.

73.     From 1963 until 2001, the Subject Property served as a Baptist convalescent home which housed approximately 90+ individuals.

74.     In 1963, the Subject Property obtained approval from BCZR, § lA0l.2.C.25 for a boarding house for the aged (40 units).

75.     Subsequent additions to the building were approved, including a building addition in 1969 to facilitate 24 more residents and in 1976 for 25 more residents.

9

76.    In 1991 two more building additions were approved to facilitate 29 more rooms.

77.    The two single-family homes on the Subject Property were used for more than 30 years as living quarters for staff of the Baptist convalescent home.

78.    The Baptist convalescent home shut down in 2001 and Henry Wright purchased the property in 2002.

79.    The Church of the Nativity, a Roman Catholic Church with a congregation of 60-75 people, leased Rainbow Hall for their Sunday morning mass for many years, including from approximately 2008 to 2012.

80.    In 2012, a hearing was set for a development plan for a 1,000 seat sanctuary with a proposed use as a multi-faith center and 250 parking spaces.

81.    Also in 2012, a second hearing was set for a proposed 156-seat church and 8 multi-family units.

82.    On May 7, 2012, the County Administrative Law Judge granted a special exception to use the Subject Property's 45,000-square foot mansion as a 212-seat church.

83.    The Valleys Planning Council, Inc., Mark Wilson, and Harlan Zinn appealed and on January 17, 2013, the Baltimore County Board of Appeals affirmed the ALJ's decision to grant a special exception for the religious use.

84.    The Board of Appeals subsequently denied the Motion for Reconsideration on March 20, 2013.

85.    The Valleys Planning Council, Inc., Mark Wilson, and Harlan Zinn filed a Petition for Judicial Review seeking review of the January 17, 2013 decision of the Baltimore County Board of Appeals and the subsequent denial by the Board of their Motion for Reconsideration.

86.    In April 2014, the Circuit Court upheld the Board of Appeals' decision to grant a special exception for use as a 212-seat church.

The County's Relevant Land Use Regulations

87.    The County regulates land use within its jurisdiction in part through the Baltimore County Zoning Regulations ("BCZR").

88.    The BCZR constitute an extremely complicated set of processes and requirements that a place of worship must navigate in order to engage in religious worship within the County, and which provide objecting residents a myriad of possibilities for attempting to delay and derail such religious land use development, even where such use is permitted in the relevant zoning district.

89.    Such regulations create unbridled discretion on the part of County decision makers as to whether or not religious land use will be permitted, and also impose many years of review and hundreds of thousands of dollars in costs to any such applicant.

90.    The portions of the BCZR that pertain to the development of religious land use creates substantial uncertainty, delay and expense for religious uses.

91.    The subject Property is located primarily in the R.C.2 -Resource Conservation - Agricultural Zone ("RC-2"), with a small portion in the R.C.5 -Resource Conservation - Rural-Residential Zone ("RC-5").

92.    The proposed school improvements, none of which are exterior in nature, are entirely within the RC-2 zoning district.

93.    The stated purpose of the RC-2 zoning district is to "foster conditions favorable to a continued agricultural use of the productive agricultural areas of Baltimore County by preventing incompatible forms and degrees of urban uses."

94.     The RC-2 zoning district permits the following uses:

Catering halls converted from existing dwellings on which agriculture education activities also occur, provided the property is at least 20 acres and no more than 50 acres in size with at least 300 feet of frontage on or abutting a state highway and located within the Hanover Pike Corridor Study Area, and subject to Section 402.3 of these regulations.

Museums pursuant to 402D.1.

95.     The permitted use of catering hall in the R-C 2 zoning district is subject, in pertinent part, to the following restrictions (BCZR 402.3):

   i. For purposes of this subsection, an "event" shall refer to any rental of the property which is attended by at least 75 guests. The use of the property solely for agricultural education activities shall not be considered an "event" under this subsection.

   ii. A catering hall converted to such use from a dwelling located in an R.C.2 zone and within the Hanover Pike Corridor Study Area is subject to the following requirements so long as a catering hall is operating on the property:

      1. General restrictions.

         a. The number of events on the property shall not exceed 150 per calendar year.

         b. No more than 300 guests may attend any event held at the property.

c. Sound levels for events may not exceed the maximum allowable noise levels ("DBA") for commercial uses set forth in COMAR Section 26.02.03.02.

96. The RC-2 zoning district permits, by special exception, "schools including schools for agricultural training, private preparatory schools, business or trade schools, conservatories, colleges, community colleges, universities, or institutes for continuing education."

97. The legislative determination by Baltimore County that schools are a permitted "special exception" use means that it is a conditional use that shares the legal presumption of validity, absent a showing that it should be denied because of particular egregious impacts at the locale considered. *See Schultz v. Pritts*, 291 Md. 1, 22-23, 432 A.2d at 1331 (1981); *see also Attar v. DMS Tollgate, LLC*, 451 Md. 272, 285 (2017); *People's Counsel for Baltimore Cnty. v. Loyola College*, 406 Md. 54, 106, 956 A.2d 166 (2008).

98. As such, it is presumed that a rabbinical college located within the RC-2 zoning district is part of the comprehensive zoning plan and such colleges therefore share a presumption that they are in the interest of the general welfare and are valid.

99. The off-street parking requirement for dormitories in the RC-2 zoning district is "1 per 4 beds." (BCZR 409.6)

100. The off-street parking requirement for a college, university, business, trade or technical school is "1 per employee, plus visitor spaces and student parking as determined by the Zoning Commissioner."

101. The off-street parking requirement for other nonreligious assembly and institutional uses in the RC-2 zoning district include:

a. Catering Hall: 20 per 1,000 square feet of gross floor area with at least 10 spaces required in all cases. (BCZR 409.6)

13

b.  Church, house of worship or religious assembly: 1 per 4 seats in the principal place of worship.

c.  Golf course: 8 per hole.

d.  Elementary or middle school: 1 per employee, plus visitor spaces as determined by the Zoning Commissioner.

e.  Airports: no requirement

f.  Camps, including day camps: no requirement.

g.  Community care centers: no requirement.

h.  Community building owned by a nonprofit civic or improvement association and used by its members and guests for recreational, social, educational, or cultural activities: no requirement.

i.  Farm market: no requirement.

j.  Country clubs: no requirement.

k.  Rail passenger station: As determined by the Zoning Commissioner upon the recommendation of the State of Maryland Mass Transit Administration.

l.  Volunteer fire company or ambulance-rescue facilities: no requirement.

102.    The off-street parking requirement for other nonreligious assembly and institutional uses in the RC-5 zoning district include:

a.  Church, house of worship or religious assembly: 1 per 4 seats in the principal place of worship.

b.  Golf course: 8 per hole.

c.  Elementary or middle school: 1 per employee, plus visitor spaces as determined by the Zoning Commissioner.

d.  Camps, including day camps: no requirement.

e.  Community buildings, swimming pools or other uses of a civic, social, recreational or educational nature, including tennis facilities, provided that no tennis facility shall comprise more than four courts: no requirement.

f.  Country clubs: no requirement.

g.  Other similar outdoor recreation clubs: no requirement.

14

    h.   Rail passenger station: As determined by the Zoning Commissioner upon the recommendation of the State of Maryland Mass Transit Administration.

    i.   Volunteer fire company or ambulance-rescue facilities: no requirement.

103.    Such nonreligious assembly and institutional land uses are treated on better terms under the BCZR with respect to off-street parking requirements than are colleges.

Bais Medrash's Zoning Application

104.    Rabbi Newman purchased the Subject Property with the expectation that Bais Medrash would be able to be used as a rabbinical college, which is a permitted special exception use in the RC-2 zoning district.

105.    Sections 500.2 and 500.5 of the BCZR provide that an applicant such as Bais Medrash shall apply for special exception by filing a petition seeking said relief with the County Administrative Law Judge in a form prescribed by him.

106.    A hearing is then scheduled before the County Administrative Law Judge.

107.    Plaintiff filed a Petition for Special Exception from the BCZR, Section 1A01.2.C.25, to permit a rabbinical college, including dormitories.

108.    Petitioners also requested a Special Hearing from BCZR, Sections 5007 and 409.6.A.3 as follows:

    a)  to confirm that 45 parking spaces are sufficient to support the rabbinical college.

    b)  to amend the previously approved site plan in Case No. 2010-0280-SPH regarding the continued use of three single family homes as nonconforming uses.

    c)  to confirm that no new landscaping is required for conversion of the existing improvements into the school.

109.   The Department of Planning ("DOP") and Department of Environmental Protection Sustainability ("DEPS") submitted Zoning Advisory Committee ("ZAC") comments in which the agencies did not oppose the proposed zoning relief.

110.   The Office of the Administrative Hearings for Baltimore County held public WebEx hearings on April 5, 20-24 and May 29, 2024.

111.   At the hearing, Rabbi Yeshaya Wilhelm, who was involved with the formation and organization of Bais Medrash, testified about the proposed plans to operate a rabbinical college.

112.   John Motsco testified as an expert that the Special Exception will not violate any of the requirements of BCZR, § 502.1.

113.   There was significant opposition by local residents opposed to Bais Medrash's use, and by professionals hired by such witnesses.

114.   Such testimony was contradicted by prevailing law, the evidence presented by expert testimony, the County itself, and the Administrative Law Judge that first heard the application.

115.   Such testimony demonstrated hostility and distrust toward Bais Medrash.

116.   Neighbor Mark Wilson testified about his concerns including sight distance when coming out his driveway onto Park Heights and the inability to see southbound traffic.

117.   Renee Hamidi, Executive Director of the Valleys Planning Council testified in opposition while admitting that there is already a school – Oldfields – with a dormitory component in the RC-2 zoning district.

118.   John Koontz, Environmental consultant, testified in opposition as an expert and opined that the existing septic system does not have sufficient capacity to handle the wastewater associated with the proposed use.

119.   Paul White, geologist and hydrogeologist, testified in opposition as an expert and opined that the proposed rabbinical college would have too much wastewater going into the ground and too much nitrate, potentially resulting in unsafe conditions for the drinking water of offsite property owners.

120.   Neighbor Paul Brickman, a non-expert, testified about his traffic concerns.

121.   On July 19, 2024, Administrative Law Judge ("ALJ") Andrew M. Belt granted a special exception and associated special hearing relief permitting the establishment and operation of a rabbinical college at 10729 Park Heights Avenue, Owings Mills, Maryland.

122.   Judge Belt rejected Protestants' argument that a "dormitory" is a separate use under the Zoning Regulations which is not allowed in the RC-2 zoning district.

123.   Judge Belt noted that "colleges" are allowed by Special Exception, the plain meaning of which includes dormitories, as evidenced by the Webster's Third New International Dictionary (2002) definition of "college" as "a dormitory for students" or "a university offering living quarters."

124.   Judge Belt found that the Special Exception for "schools, including schools for agricultural training, private preparatory schools, business or trade schools, conservatories or colleges" contemplated in BCZR, § lA0l .2.C.25 does not prohibit the dormitory component of the proposed rabbinical college in the RC 2 zone.

125.   While Judge Belt noted the Protestants' concerns about wells and septic, he wrote that "it is customary for inspections and reports to be conducted after zoning relief is awarded, and before permits are issued."

126. Judge Belt further underscored that "it is customary that determinations regarding the adequacy of such [septic] systems are within the purview of GWM [Ground Water Management]."

127. As such, Judge Belt held that approval of the requested Special Exception will be conditioned on compliance with Groundwater Management's Zoning Advisory Comment on the proposed special exception.

128. Judge Belt further held that there will be limited traffic impacts due to students living on campus and minimal noise due to the quiet study environment.

129. While Protestants opposed the Special Exception in part based on sight distance concerns, Judge Belt was satisfied with Mr. Motsco's testimony that there will be minimal traffic and all traffic out of the Subject Property will be directed to the southern access point, where there is adequate sight distance.

130. Judge Belt further granted the Petition for Special Hearing from BCZR §§ 500.7 and 409.6.A.4 as follows:

   a) To confirm that 45 parking spaces is sufficient to support the proposed rabbinical college use, be and is hereby

   b) To amend the previously approved site plan and relief in Case No. 2010-0280-SPH, specifically regarding continued use of the three existing single-family homes approved as nonconforming uses.

   c) If necessary, to confirm that no new landscape will be required for the conversion of the existing improvements into the proposed rabbinical college use

131. Judge Belt granted the aforementioned relief, subject to the condition that Petitioners must comply with the DEPS and specifically the GWM ZAC comments.

132. Protestants Valley Planning Council and Mark Wilson appealed the decision to the Baltimore County Board of Appeals ("BCZA").

133. The Baltimore County Board of Appeals held six days of in-person *de novo* hearings.

134. The hearings occurred on May 5, May 28, May 29, July 14, July 15, and August 28, 2025.

135. At the hearing, the Petitioners called Rabbi Nosson Newman as a witness.

136. Rabbi Newman testified that Bais Medrash planned to expand to a maximum of 100 students if the requested relief was granted.

137. Rabbi Newman testified that the students would reside in dormitories located in a renovated portion of the existing building, which was previously used for residential purposes.

138. He testified that the first floor of the dormitory wing has approximately 15 rooms which could accommodate 60 students total with four students per dorm room.

139. Rabbi Newman further testified that Bais Medrash has no plans to utilize the two existing rental homes on the property for educational activities, although staff housing may be considered for one currently vacant home.

140. Rabbi Newman confirmed that staff will not reside in the main building, except during the Sabbath, when driving is prohibited.

141. Rabbi Newman stated that meals are currently prepared off-site and delivered twice daily, with plans to eventually utilize an existing commercial kitchen on the premises pending approval.

19

142. Rabbi Newman also testified that there would be only four or five students commuting to Bais Medrash, while the remaining students would live on campus.

143. Rabbi Newman testified that students are currently not permitted to have personal vehicles, except in rare cases for special circumstances, and then only with tight controls.

144. Bais Medrash currently maintains two vehicles for limited use by students during free periods.

145. Additionally, Rabbi Newman testified that there are currently a number of washing machines connected to the septic system.

146. John Motsco, licensed professional engineer with D.S. Thaler & Associates, testified for the Petitioners as an expert in civil engineering and zoning and development matters in Baltimore County.

147. Engineer Motsco testified that traffic impact would be significantly lower than other institutional uses because students are cloistered on-site.

148. Additionally, Engineer Motsco testified that the project would not generate congestion or create hazards for fire, panic, or other dangers.

149. Mickey Cornelius, senior vice-president of The Traffic Group, also testified as a traffic expert for the Petitioners.

150. Mr. Cornelius testified that only modest traffic would be generated because there would be very few commuting students.

151. Gary Schnitzer, resident of Velvet Valley Neighborhood, testified for Protestants about his traffic concerns.

152. Mr. Schnitzer is not an expert in traffic matters.

153. Paul Brickman, resident of Velvet Valley neighborhood, testified for Protestants about his traffic concerns and "disruption to neighborhood character."

154. Mr. Brickman is not an expert in traffic matters.

155. Mr. Brickman, who was authorized to speak on behalf of the Velvet Valley Neighborhood Association ("VVNA"), further testified that VVNA opposes the rabbinical college's proposed use.

156. Mark Wilson, neighbor to the Subject Property, testified for Protestants about his traffic concerns and noise concerns.

157. Mr. Wilson further testified that he is concerned that Bais Medrash will make noise "all day and into the night."

158. Additionally, Mr. Wilson testified that he is skeptical that Bais Medrash will keep their word and limit the number of cars to a minimum.

159. The Subject Property's existing septic system was designed for a capacity of 9,022 gallons per day ("gpd").

160. James R. Powell, who worked for Groundwater Management and designed the septic system at the time of installation in 1997, testified that the maximum capacity of the septic system is 9,022 gpd.

161. Mr. Powell further explained that the septic trench system consists of two separate zones, each of which can accommodate 4,551 gpd, leading to a total 9,022 gpd capacity.

162. Groundwater Management issued Zoning Advisory Committee ("ZAC") comments concerning well and septic.

163. John Motsco, licensed professional engineer with D.S. Thaler & Associates, testified for the Petitioners as an expert in civil engineering and zoning and development matters in Baltimore County.

164. Engineer Motsco testified that after the zoning stage, Bais Medrash would then need to to satisfy all applicable regulatory approvals related to water and septic systems before the facility could actually be occupied, consistent with Judge Belt's decision below.

165. John Koontz testified for the Protestants as an expert in septic systems, wastewater permitting, on-site sewage disposal, and regulations and governmental requirements relating thereto.

166. Mr. Koontz, using "standard tables that the industry uses based on the type and intensity of use," testified that 100 students and 8 staff would require 15,180 gpd.

167. Upon cross-examination, Mr. Koontz admitted that an alternative way of measuring needed capacity would be using actual readings from a similar use but at a different property.

168. Petitioners introduced a letter on behalf of Bais Medrash from Patrick C. Richardson, Jr., P.E., to Kevin Koepenick, Chief of the Groundwater Management Section of the Baltimore County Department of Environmental Protection and Sustainability (hereinafter "Richardson letter").

169. The Richardson letter represented that, based on data from a New Jersey rabbinical school of approximately the same size as Bais Medrash, the anticipated effluent from 48 students and 2 staff was 2,094 gpd, well within the 9,022 gpd for which the system had been designed.

170. Paul White, licensed hydrologist with the ARM Group, testified for the Protestants as an expert in hydrogeology and groundwater impacts.

171.    Mr. White also disputed the methodology and conclusions in the Richardson letter, claiming that the existing septic system in Rainbow Hall could not support the 48 students and 2 faculty.

172.    Mr. White further testified that the area surrounding Rainbow Hall was prone to residential wells running dry.

173.    Additionally, Mr. White testified that according to a nitrate balance assessment, there would be a total nitrate concentration of 19 mg/l or 30.4 mg/l depending on the model.

174.    Mr. White testified that though there is no absolute required nitrate balance, the current rate of 10 mg/l is considered safe and environmentally sound with little or no possibility of contaminating the aquifer on the project site as well as potentially impacting surrounding properties.

175.    Mr. White testified that he spoke with Mr. Kevin Koepenick, Chief of the Groundwater Management Section of the Baltimore County Department of Environmental Protection and Sustainability, who was "unconcerned with the possibility of nitrate discharge."

176.    According to Mr. White, Mr. Koepenick accepted the Richardson letter and its underlying data.

177.    Mr. White further testified that Mr. Koepenick stated that the Baptist convalescent home had functioned without any issues, so there were unlikely to be septic issues for Bais Medrash.

178.    Paul Scott, expert in hydrologic discharge and well impact, testified for the petitioners that water use at Bais Medrash would have no impact on well failures in the area.

179.    Mr. Scott disputed much of Mr. White's testimony regarding the nitrate balance assessment, except the conclusion that 100 students with on-site food service would require pre-treatment to address nitrate balance.

180.    The Subject Property has two vehicle access points along Park Heights Avenue.

181.    Barbara Mosier, senior traffic engineer with Kittelson & Associates, testified for the Protestants as an expert in traffic engineering.

182.    Ms. Mosier testified that Park Heights Avenue has a vertical crest which limits visibility and affects stopping sight distance ("SSD") and intersection sight distance ("ISD".)

183.    Ms. Mosier testified that the site driveways do not provide adequate sight distances for safe ingress and egress.

184.    Traffic expert for the Petitioners, Mickey Cornelius, testified that the north drive could be used to enter the subject property.

185.    Mr. Cornelius further testified that at the south entrance, vehicles could both enter Bais Medrash from Park Heights and exit onto Park Heights.

186.    Engineer Motsco testified that the building is already equipped with a sprinkler system from prior uses and would be required to meet all modern safety and occupancy codes.

187.    Engineer Motsco testified that maintaining 45 parking spaces would have no adverse impact to neighboring properties, especially given that the overwhelming majority of students and staff lived on campus rather than commuting.

188.    The Subject Property is already heavily landscaped with mature vegetation due to prior institutional uses.

189. Engineer Motsco testified that a new landscape plan was unnecessary and requested that the Board waive the requirement for a new plan due to the property's existing mature vegetation.

190. Mark Wilson, neighbor to the Subject property, testified for Protestants about his traffic concerns, noise concerns, and fears that the rabbinical college may have an impact on his well.

191. Mr. Wilson testified that he is skeptical that Bais Medrash will not expand into other uses in the future.

192. Mr. Wilson testified that the 45,000 square foot building should "remain as a private home" or "be adapted to a use more consistent with the neighborhood's quiet character."

193. Rene Hamidi, executive director of the Valleys Planning Council ("VPC"), testified that there are 10 schools located in a RC-2 zoning district, one of which – Oldfields – is a boarding school.

194. Nonetheless, Ms. Hamidi testified that her organization opposed Bais Medrash's special exception request for a rabbinical college.

195. Hamidi expressed concern about allowing a special exception institution "with a history of encroachment pressure."

196. Ms. Hamidi presented no evidence to support her allegation that Bais Medrash, established in 2023, has a "history of encroachment pressure."

197. Ms. Hamidi testified to her fear that "student enrollment at Bais Medrash could expand over time, intensifying impacts beyond what was currently proposed."

198. On February 19, 2026, the Board of Appeals issued a written Opinion and Order (the "BOA Order").

199. Section 502.1 of the BCZR governs applications for special exceptions and sets forth the nine criteria to be considered for the granting of same.

200. Section 502.1 of the BCZR provides as follows:

Before any special exception may be granted, it must appear that the use for which the Special Exception is requested will not:

(a) be detrimental to the health, safety or general welfare of the locality involved;

(b) tend to create congestion in the roads, streets or alleys therein;

(c) create a potential hazard from fire, panic or other danger

(d) tend to overcrowd land and cause undue concentration of population

(e) interfere with adequate provisions for schools, parks, water, sewage, transportation or other public requirements, conveniences or improvements;

(f) interfere with adequate light and air;

(g) be inconsistent with the purposes of the property's zoning classification nor in any other way inconsistent with the spirit and intent of these zoning regulations;

(h) be inconsistent with the impermeable surface and vegetative retention provisions of these Zoning Regulations nor

(i) be detrimental to the environmental and natural resources of the site and vicinity, including forest, streams, wetlands, aquifers, and floodplains in an RC-2, RC-4, RC-5, and RC-7 zones.

201. In addition, because Bais Medrash is in a RC-2 zoning district, BCZR § 1A01.1.C imposes an additional requirement to show that the project in question would not be "detrimental to the primary agricultural uses in the vicinity."

202. There was no evidence of any agricultural uses in the vicinity, and the Protestants did not suggest the § 1A01.1.C factor had not been met, so the Board's criteria focused solely on the § 502.1 criteria.

203. Specifically, the BOA Order stated that Protestants evidence that "the septic system did not have the capacity to meet the ultimate objective as to the size of the student body" and "traffic ingress and egress from the subject property and Park Heights Avenue" raised concerns under §502.1(A),(B),(C), and (I) which "rebut or undermine Petitioners' entitlement."

204. The BOA Order held that a dormitory for Bais Medrash is not allowed as a primary use in the RC-2 zoning district because dormitories are not subsumed or inherent under the category of colleges.

205. The BOA Order further held that the proposed dormitories are not an "accessory building" because it is a substantial portion of the main building.

206. The BOA Order also held that the dormitory is not an "accessory use or structure" because it is not "subordinate" in "extent or purpose" to the principal use.

207. The BOA held that because boarding is a "central feature of the Bais Meedrash experience," it cannot be an accessory use.

208. The BOA concluded that the Bais Medrash project is "low impact" for an institutional use due to the following factors:

> the limitation on the number of students, the fact that there are very few commuter students and the vast majority of students are largely confined to the campus, the fact that as a school there are significant periods during the year when the students are not in attendance, that there are no sporting

events or many other special events that draw outside participants, that there is some history of institutional use at this site, albeit before the RC-2 classification was imposed, and that the limitations imposed by the Board will maintain the number of students at a reasonable level unless it can be shown that an increase in that number is warranted.

209. Section 502.2 of the BCZR provides that, in granting any special exception, the Administrative Law Judge or the Board of Appeals, upon appeal, shall impose such conditions, restrictions or regulations as may be deemed necessary or advisable for the protection of surrounding and neighboring properties.

210. The BOA Order applied the following list of conditions to Bais Medrash:

a) The number of boarding students is limited to 48;

b) If Bais Medrash wants to enlarge its student population, it must file a petition with the Zoning Office requesting approval for that expansion and adhere to all procedures associated with administrative hearings, including de novo appeal to this Board and judicial review;

c) If Bais Medrash wants to provide onsite food service and/or onsite laundry facilities, it can do so only with the permission of the appropriate Baltimore County authorities upon a showing that the septic system, water supply system, nitrate balance, and any other relevant considerations can accommodate those modifications;

d) Except in exceptional circumstances, no student at Bais Medrash will be permitted to have his own vehicle for transportation, and Bais Medrash may maintain two vehicles onsite for the use of students as needed;

e)  The property shall not be used for any events that are not school functions, and any such events or functions shall conclude any activity outside of the school buildings by 10:00 p.m.;

f)  Any outdoor events that use enhanced audio equipment shall be kept to a minimum, and no enhanced audio equipment can be used after 8:00 p.m.;

g)  Petitioners must comply with all requirements of the Department of Environmental Protection and Sustainability (DEPS) and specifically all of the requirements listed in the memorandum dated February 12, 2024, from the Zoning Advisory Committee (ZAC), a copy of which is attached hereto and made a part hereof.

h)  Ingress to the property is restricted to the north driveway only and egress is restricted to the south driveway only.

211.  The BOA Order further granted a Petition for Special Hearing that

a)  45 parking spaces are sufficient to support the proposed rabbinical college

b)  the previously approved site plan and relief in Case No. 2010-0280-SPH, is amended specifically to allow the continued use of the three pre-existing homes approved as non-conforming uses; and

c)  no new landscaping will be required for the conversion of the existing improvements into the proposed rabbinical college use.

The Conditions Substantially Burden Bais Medrash's Religious Exercise

29

212.    The conditions set forth by the Board in the BOA Order burden Bais Medrash's religious exercise and prevent the rabbinical college from engaging in religious education according to traditional Orthodox Jewish practice.

213.    The condition limiting the number of boarding students to 48 ("condition a") is unduly burdensome and wholly unjustified by the record before the Board.

214.    The BOA claimed that the number of boarding students must be limited to 48 because the septic system cannot accommodate more students.

215.    However, Mr. Kevin Koepenick, Chief of the Groundwater Management Section of the Baltimore County Department of Environmental Protection and Sustainability, accepted the Richardson letter and its underlying data, according to testimony from the Protestant's own witness, which stated that the septic system *could* accommodate the proposed 100 students.

216.    The BOA admits that County authorities such as Mr. Koepenick would normally make determinations about septic, water use, and nitrate balance.

217.    The Department of Planning ("DOP") and Department of Environmental Protection Sustainability ("DEPS") submitted Zoning Advisory Committee ("ZAC") comments in which the agencies did not oppose the proposed zoning relief.

218.    As such, Judge Belt held below that approval of the requested Special Exception would be conditioned on compliance with Groundwater Management's Zoning Advisory Comment on the proposed special exception, especially because determinations about septic systems customarily occur after zoning relief is granted.

219.    And yet, the BOA stated that in the case of Bais Medrash, "it is difficult to rely on the County to properly oversee a project of this size as to any expansion."

220. Notably, the BOA opposed zoning relief despite no opposition from the Department of Planning and Department of Environmental Protection and Sustainability.

221. Upon information and beliefs, it is a highly abnormal procedure deviation for septic and well inspections and reports to be conducted before zoning relief is awarded.

222. Upon information and beliefs, determinations about septic systems are typically within the purview of Groundwater Management and occur after zoning relief is awarded but before permits are issued.

223. Upon information and belief, it is a substantive deviation for the BOA Order to write that "While we do not normally question the County's interest and ability to make these sorts of determinations [about septic, water use, and nitrate balance], we are not completely credulous, and we cannot be expected to relinquish our authority to examine these issues critically."

224. Under the conditions, religious education will be greatly impacted and burdened if Bais Medrash is forced to comply with the multitude of restrictions.

225. The ability to engage in partnered study – in line with centuries of Jewish tradition – is of fundamental importance to Bais Medrash's religious exercise.

226. The students study throughout the day, in different styles and at different levels.

227. Arbitrarily limiting the maximum number of students to 48 arbitrarily limits the number of potential study partners to only a handful. Students have less choice and, therefore, fewer opportunities to engage in this style of learning.

228. The limitation of students to 48 constitutes a severe burden on the Plaintiff's religious exercise.

229. Arbitrarily limiting the maximum number of students also limits Bais Medrash's ability to offer different prayer services, including those that require a *minyan*, or group of 10 men.

31

230. Nor is there any compelling reason to forbid Bais Medrash students from having their own vehicles for transportation, except in exceptional circumstances ("condition d").

231. This condition is not necessary because the BOA Order states that 45 parking spaces are sufficient to support the Rabbinical College.

232. It is unduly burdensome, irrational, and restrictive to forbid students from having vehicles, except under exceptional circumstances, when there are at least 45 parking spaces available.

233. There is no public transportation in the vicinity of the Subject Property.

234. The area around the Subject Property is not walkable.

235. Students may need to bring a car to campus from time to time to attend doctor's appointments or to travel to events such as weddings.

236. The term "exceptional circumstances" is vague and undefined.

237. As written, condition d would force Rabbi Newman to consider whether a student's need to attend a wedding – itself a religious act – is an exceptional circumstance or not.

238. Rabbi Newman would have to consider whether a student's vehicle would be permitted in each instance.

239. The Bais Medrash would also face the possibility of complaints regarding the number of cars on the property such that Rabbi Newman would have to justify each "exceptional circumstance" to the County.

240. Each of these situations would prevent Rabbi Newman from providing the kind of *shiur* necessary for the Bais Medrash's religious exercise.

241. It is also unduly burdensome to restrict Bais Medrash to only two vehicles onsite for the use of students.

242. The Board of Appeals for Baltimore County seems determined that only two vehicles for students, and a few staff vehicles, should occupy the 45 parking spaces, which places an undue burden given that students may need cars to attend doctors appointments, out-of-town weddings, or other off-campus events.

243. Upon information and belief, limiting an entire student body to only using two cars is an unheard-of restriction, unique in the level of minute control that the Board of Appeals seeks to exert over on-campus dormitory students.

244. As a matter of its religious exercise, Bais Medrash needs to be able to provide onsite food service and laundry facilities.

245. Students should not be required to leave the reflective school environment in order to do their laundry.

246. Forcing them to leave the premises in order to do laundry will prevent them from fully engaging in the prayer and study built into the school day, and for which they are attending the school.

247. Boarding students engage in rigorous studies for 10 to 15 hours, seven days a week, and do not have time to go to the laundromat.

248. The requirement to conduct laundry offsite is also financially burdensome, as it is more expensive to pay at the laundromat than to use the washing machines currently onsite which are already connected to the septic system.

249. There is no legitimate reason justifying the imposition of this condition.

250. If Bais Medrash does not meet the conditions imposed in the BOA Opinion and Order, it will not have adequate facilities for a rabbinical college with boarding students, which will severely burden its religious exercise.

251. If the conditions are violated, the County can pursue fines and other remedies against Bais Medrash.

252. The Defendants' actions severely impede and prevent the Bais Medrash's exercise of religion.

253. The Defendants' actions targeting Plaintiff took place within a system of formal procedures that permitted the Defendants to make individualized assessments for the uses for the Subject Property involved.

254. Actions by Plaintiff would affect interstate commerce by or through, amongst other things, serving as a site for ongoing fundraising; its receipt of charitable donations from persons working or living outside of the State of Maryland; the use of means of interstate communication to facilitate the Plaintiff's ongoing operations; the use of interstate travel related to the Plaintiff's ongoing operations; and the purchase of goods and services related to the Plaintiff's ongoing operations and maintenance.

255. The Defendants' actions described above all took place under color of state law.

256. The Defendants were informed of the applicability of RLUIPA to their actions.

257. Upon information and belief, the Defendants knew or should have known that their actions were contrary to Plaintiff's statutory or constitutional rights.

258. The harm to Plaintiff caused by the Defendants' laws and actions, which restrict its use of the Property to accommodate its religious needs, is immediate and severe.

259. The Defendants' laws and actions imminently threaten to substantially burden Plaintiff's free exercise of religion.

260. The Defendants did not use the least restrictive means of achieving any governmental interest purportedly threatened by Plaintiff's proposed use.

261.	There are no quick, reliable, and viable alternative options for Plaintiff's operations.

262.	Plaintiff has no adequate remedy at law for the harm and damage caused by the Defendants' wrongful laws and actions.

263.	Plaintiff has also suffered significant financial damages as a result of the Defendants' laws and their application to Plaintiff.

## COUNT I

### United States Constitution
### 42 U.S.C. § 1983: First Amendment
### Free Exercise of Religion

264.	Paragraphs 1 through 263 are incorporated by reference as if set forth fully herein.

265.	Defendants have deprived and continue to deprive the Plaintiff of its right to free exercise of religion, as secured by the First Amendment to the United States Constitution and made applicable to the States by the Fourteenth Amendment, by burdening their religious exercise without using the least restrictive means of achieving a compelling governmental interest.

## COUNT II

### United States Constitution, Fourteenth Amendment
### 42 U.S.C. § 1983
### Equal Protection

266.	Paragraphs 1 through 265 are incorporated by reference as if set forth fully herein.

267.	By imposing unreasonable conditions on the Plaintiff's Approval and by Defendants' actions as aforesaid, Defendants have deprived and continue to deprive the Plaintiff of its right to equal protection of the laws, as secured by the Fourteenth Amendment to the United

States Constitution, by discriminating against it in the implementation of their land use regulations, on their face and as applied to Plaintiff.

268.    Defendants' actions as aforesaid, have caused significant damage to Plaintiff.

269.    Defendants are liable for the damage caused to Plaintiff, and should be enjoined from further violating Plaintiff's rights.


## COUNT III

**Religious Land Use and Institutionalized Persons Act of 2000**
**"Substantial Burdens"**
**42 U.S.C. § 2000cc(a)**

270.    Paragraphs 1 through 269 are incorporated by reference as if set forth fully herein.

271.    Defendants have deprived and continue to deprive the Plaintiff of its right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations both on their face and as applied in a manner that places a substantial burden on the Plaintiff's religious exercise without using the least restrictive means of achieving a compelling governmental interest.


## COUNT IV

**Religious Land Use and Institutionalized Persons Act of 2000**
**"Equal terms"**
**42 U.S.C. § 2000cc(b)(1)**

272.    Paragraphs 1 through 271 are incorporated by reference as if fully set forth herein.

273.    By imposing unreasonable conditions on the Plaintiff's Approval and by Defendants' actions as aforesaid, Defendants have deprived and continue to deprive the Plaintiff of its right to the free exercise of religion, as secured by RLUIPA, by implementing land use

36

regulations in a manner that, on their face and as applied, treats religious land uses on terms that are less than equal to nonreligious assembly and institutional land uses.

274. Defendants' actions as aforesaid, have caused significant damage to Plaintiff.

275. Defendants are liable for the damage caused to Plaintiff, and should be enjoined from further violating Plaintiff's rights.

## COUNT V

### Religious Land Use and Institutionalized Persons Act of 2000
### "Nondiscrimination"
### 42 U.S.C. § 2000cc(b)(2)

276. Paragraphs 1 through 275 are incorporated by reference as if set forth fully herein.

277. By imposing unreasonable conditions on the Plaintiff's Approval and by Defendants' actions as aforesaid, Defendants have deprived and continue to deprive the Plaintiff of its right to the free exercise of religion, as secured by RLUIPA, by implementing land use regulations in a manner that, on their face and as applied, discriminates against it on the basis of religion and religious denomination.

278. Defendants' actions as aforesaid, have caused significant damage to Plaintiff.

279. Defendants are liable for the damage caused to Plaintiff, and should be enjoined from further violating Plaintiff's rights.

## COUNT VI

### Fair Housing Act
### 42 U.S.C. § 3604(a)

280. Paragraphs 1 through 279 are incorporated by reference as if set forth fully herein.

Defendants, through their actions and the actions of their agents described above, are liable for the

violation of Plaintiff's rights under the federal Fair Housing Act, 42 U.S.C. § 3604(a), under which it is unlawful to "[t]o sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religious, sex, familial status, or national origin."

## COUNT VII

### Fair Housing Act
### 42 U.S.C. § 3604(b)

281.    Paragraphs 1 through 280 are incorporated by reference as if set forth fully herein. Defendants, through their actions and the actions of their agents described above, are liable under 42 U.S.C. § 3604(b), which makes it unlawful to "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religious, sex, familial status, or national origin."

## COUNT VIII

### Maryland Constitution
### Declaration of Rights, Article 36
### Free Exercise of Religion

282.    Paragraphs 1 through 281 are incorporated by reference as if set forth fully herein.

283.    Defendants have interfered with the Plaintiff's duty to worship God and conduct religious education in such manner as they think most acceptable, denied the Bais Medrash the protection of the religious liberty to which it is entitled, and have molested Bais Medrash in its person and their estate, on account of its religious persuasion, profession, and religious practice, without justification.

## COUNT IX

38

**Judicial Review of Administrative Agency Decision**

284.     Paragraphs 1 through 283 are incorporated by reference as if set forth fully herein.

285.     On February 19, 2026, the Board of Appeals issued a written Opinion and Order (the "BOA Order").

286.     Plaintiff requests judicial review of the BOA Order dated February 19, 2026 in case number 24-029-SPHX.

287.     The Plaintiff was a party to the proceedings before the Board of Appeals, which culminated with the Board's imposition of conditions that substantially burden Bais Medrash's religious exercise and prevent it from utilizing the Subject Property as a rabbinical college that will meet its needs for religious education.

288.     The flaws in the Board's Opinion, as described herein above, and its incorrect application of the BCZR § 502.1 special exception standards to the proposed use at issue, are arbitrary and capricious and constitute legal error as a matter of law.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully request that this Court grant the following relief:

1.     A declaration that the imposition of conditions upon Plaintiff's religious exercise through the Board of Appeals' Opinion and Order is void, invalid, and unconstitutional on its face and as applied to the Plaintiff on the ground that it violates the Free Exercise Clause of the United States Constitution, 42 U.S.C. § 1983, the Equal Protection Clause of the Fourteenth Amendment, 42 U.S.C. § 1983, the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §§ 2000cc(a), (b)(1), and (b)(2), the Fair Housing Act, 42 U.S.C. § 3604, the Maryland Constitution's Declaration of Rights, Article 36, and state law.

2.     Preliminary and permanent orders enjoining the Defendants, their officers, employees, agents, successors, and all others acting in concert with them from applying their laws to Plaintiff in a manner that violates the Free Exercise Clause of the First Amendment to the United States Constitution, the Equal Protection

Clause of the Fourteenth Amendment, the Fair Housing Act, the Religious Land Use and Institutionalized Persons Act, and the Maryland Constitution, and state law, or undertaking any and all action in furtherance of these acts;

3. An award of compensatory damages against the Defendants in favor of the Plaintiff, in an amount to be determined at trial for the loss of its rights under the First Amendments to the United States Constitution, the Religious Land Use and Institutionalized Persons Act, and the Maryland Constitution, incurred by the Plaintiff and caused by the Defendants' laws and actions;

4. An award to the Plaintiff of full costs and attorneys' fees arising out of Defendants' actions and land use decisions and out of this litigation; and

5. An order granting such other and further relief to the Plaintiff as this Court may deem just and appropriate.

Dated: March 20, 2026

**STORZER & ASSOCIATES, P.C**.

Roman P. Storzer (28285)
Blair Lazarus Storzer (18672)
1025 Connecticut Ave., N.W. Suite 1000
Washington, D.C. 20036
Tel: 202.857.9766
Fax: 202.315.3996
storzer@storzerlaw.com
bstorzer@storzerlaw.com

*Of Counsel*

**NEUBERGER, QUINN, GIELEN, RUBIN & GIBBER P.A.**

*/s/ Nathan D. Adler*
Nathan D. Adler (22645)
One South Street, 27th Floor
Baltimore, Maryland 21202
Tel: 410.332.8516
Fax: 410.332.8594
nda@nqgrg.com

*Attorneys for Plaintiff*

40